IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PHILIP J. GUYLE, JR.,

        Plaintiff,

v.                                            Case No. 19-3176-JWB

MIKE VOIGTS, *et al.,*

        Defendants.

**MEMORANDUM AND ORDER**

This case comes before the court on the following: motion for summary judgment (Doc. 46) by the sole remaining Defendant, Mike Voigts (Doc. 46); motions by Plaintiff for leave to file under seal and to file a surreply (Docs. 54, 61); and Defendant's motion to strike the surreply (Doc. 60).  The motions have been adequately briefed and are ripe for decision.  (Docs. 47, 53, 56, 57, 58, 59, 62, 63, 64.)  For the reasons stated herein, Plaintiff's motion to file under seal (Doc. 54) is GRANTED; Plaintiff's motion to file a surreply (Doc. 61) is DENIED; Defendant's motion to strike surreply (Doc. 60) is GRANTED; and Defendant's motion for summary judgment (Doc. 46) is GRANTED.

**I.  Preliminary Matters**

Plaintiff's motion for leave to file attachments under seal (Doc. 54) is GRANTED.  The attachments need not be separately filed, as the court has considered the attachments (Doc. 54-1) in deciding the motion for summary judgment.

Plaintiff's motion for leave to file a surreply (Doc. 61) is DENIED.  Surreplies "are permitted only with leave of court and under 'rare circumstances' after good cause is shown."

*James v. Boyd Gaming Corp.*, No. 19-2260-DDC-JPO, 2021 WL 794899, at *5 (D. Kan. Mar. 2, 2021) (citations omitted).  Plaintiff fails to show good cause to file a surreply.  He argues he could not have included the surreply arguments in his initial brief because of his limited ability to do legal research in a restricted housing unit.  (Doc. 61 at 3.)  But Plaintiff could have sought additional time to file his initial brief if he thought his opportunity for research was inadequate.  As it is, Plaintiff's initial 50-page brief far exceeded this court's standing order limiting summary judgment briefs to 30 pages, and his 29-page surreply brief (Doc. 59) is filled with factual and other arguments that could have been made in the first instance.  The court concludes Plaintiff has not shown good cause for filing a surreply.  Defendant's motion (Doc. 60) to strike the surreply is GRANTED.

## II.  Uncontroverted Facts

The court finds the following facts are not genuinely controverted for purposes of summary judgment.  Immaterial facts, allegations not supported by the parties' citations, and legal conclusions in the parties' submissions are omitted from the following statement.   The evidence cited by the parties includes security camera video footage and officer body camera recordings (audio and video) of the relevant incident.[1]  In keeping with the standards governing summary judgment, the court accepts the version of the facts portrayed in these videos only to the extent the videos indisputably show the facts and, to the extent the videos conflict with assertions by Plaintiff, the videos "blatantly contradict" Plaintiff's version of events.  *See Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020); *Kapinski v. City of Albuquerque*, 964 F.3d 900, 903 n.2 (10th Cir. 2020).

---

[1] The video exhibits were submitted with the *Martinez* report, Doc. 15, attachments 8-11, and were conventionally filed on a disc. (Doc. 21.)  These exhibits include body camera recordings of officers Woods, Taylor, and Voigts, as well as video from a security camera.  For the sake of clarity, the court cites the body camera videos by referring to the officer's name and to the time stamp on the recording.

In January 2019, the State of Kansas charged Plaintiff with aggravated assault, criminal threat, and battery, from an incident in which he was alleged to have beaten a cellmate and threatened him with a homemade knife.  (Doc. 15-5.[2])

Plaintiff was being held in pretrial detention at the Franklin County Jail ("the Jail") at the time relevant to the instant suit.  Defendant was a corporal with the Franklin County Sheriff's Office at the time relevant to this suit.

On March 11, 2019, three days prior to the incident giving rise to this suit, Plaintiff was involved in two incidents at the Jail that required intervention by Franklin County Sheriff's deputies.  The first episode occurred at about 7 p.m., when Plaintiff's cell, which he shared with another inmate, was intentionally flooded.  At about 10 p.m., Plaintiff and corrections officers got into a physical altercation when Plaintiff was caught trying to set off the sprinkler in the cell and punching out ceiling tiles.  (Doc. 47 at 2; Doc. 53 at 3-4.)  Officers used physical force to restrain Plaintiff.  Plaintiff pushed an officer and made swinging motions at two officers who attempted to place him in handcuffs.  Plaintiff then grabbed a third officer's vest and tried to pull him to the ground.  It took five officers to restrain Plaintiff.  (Doc. 47 at 2-3; Doc. 53 at 5-6.)  Plaintiff said "I'm done" multiple times before officers released a choke hold on him.  (Doc. 53 at 5.)  Plaintiff believed he was subjected to excessive force during the incident and was "resisting because he was trying to defend [himself] from an assault." [3]  (*Id*.)

---

[2] On March 25, 2019, Plaintiff was convicted of making a criminal threat and was sentenced to 17 months in prison. (Doc. 15-6 at 1-6.)
[3] Plaintiff was charged with battery and other offenses arising out of the March 11, 2019, incident, but the State of Kansas dismissed the case against him on July 13, 2020.  (Doc. 54-1 at 6.)  Plaintiff contends the dismissal came after he raised allegations of excessive force.

On March 14, 2019, at about 10:30 p.m., a jailer found Plaintiff's cell was flooding. Plaintiff's cellmate, Bobby Whisnant, caused the flooding.  Whisnant also started opening food packets and dumping them on the catwalk (i.e., the passageway outside the cell).[4]  When Plaintiff asked him what was wrong, Whisnant said something nonsensical and put more items in the toilet so it would flood.  Whisnant said he wanted Plaintiff to "have his back."  Plaintiff picked up a chair and hit the bars with it, saying "I do have your back," but added that he would cooperate "if the cops come" because he's "been in too much trouble lately."  (Doc. 54-1 at 8.)

Plaintiff was standing by the toilet when Officer Macklin entered the catwalk and asked what was going on.  Whisnant started yelling and cursing at him.  Jailers requested assistance from the Franklin County Sheriff's Office.  When detention deputy Corporal Brandon Barkley arrived at the cell, he saw Whisnant barricading himself in the corner with a plastic bunk.  Plaintiff was by the toilet, which was full of trash and clothing and had flooded water all over the floor.  The glass screen on the cell's phone kiosk had been broken out and there was broken glass on the floor. (Doc. 15-15 at 1-2.)  Barkley asked Plaintiff what the problem was; Plaintiff said he (Barkley) would have to ask Whisnant.  Whisnant continued to yell and curse at Barkley when asked what was wrong.  Barkley started to pull out his key to open the door.  (Doc. 54-1 at 9-10.)  Plaintiff said, "If you come in here, he will fight you."  (Id. at 10.[5])

Sergeant Woods, the first of four Franklin County Sheriff's officers to respond, proceeded to the cell.  On the way, a jailer informed him that "as soon as we open the door, they said it's

---

[4] Security video footage shows Whisnant dumping food or other items outside the cell onto the catwalk.  At one point, Whisnant climbed on a table and threw what appears to be spaghetti at a security camera located above the catwalk. When that failed to achieve its apparent purpose of covering up the security camera, Whisnant obtained a tube of shampoo or soap and sprayed it on the camera.  Plaintiff thereafter placed a blanket across the cell bars in a manner that largely blocked the camera's view of the cell.  The incident in question is thus only partially visible on the security camera video recording.
[5] The jailer's version is that Plaintiff said, "we will fight you" (Doc. 15-15), but the court accepts Plaintiff's version for purposes of summary judgment.

going to be a fight, just like last time." (Woods video at 10:59:20 p.m.) When he arrived, Sgt. Woods tried to calm the situation but Whisnant repeatedly yelled and cursed at him. When Woods attempted to talk with him, Whisnant interrupted with "Fuck you, man." (Doc. 47-2 at 1.[6]) When Woods indicated he was trying to be civil, Whisnant called Woods a "bitch ass cop." (*Id.*) Plaintiff chimed in, "He's right. You a bitch ass cop." (*Id.*) Whisnant ranted about one of the jailers and said to Woods, "Fuck you and all your fucking friends," before deriding Woods as "a negotiator." Woods said he was not a negotiator and that "[i]f I have to come in there, it ain't going to be cool." (*Id.*; Woods video at 11:00-11:01.)

Whisnant was in a corner of the cell partially barricaded behind the plastic bunk. As Whisnant continued to rant, Woods asked Plaintiff ("PJ"), who was standing toward the other end of the cell, what the issue was. Plaintiff responded, "Exactly what [cuz] said, y'all done fucked up. Y'all ain't comin' in." (Woods video at 11:02:15 p.m.) Woods said, "Yeah, we are coming in if you guys don't come out," and again asked Plaintiff what the issue was. Plaintiff said, "You come in here, I'll push you up against that wall. You may be big but I'm strong, you believe that." (*Id.* at 11:02:31.) Woods asked, "Is this really how you guys want to go down?" adding, "I'm giving you a chance PJ." Whisnant responded, "Yeah, I guess so," and told Plaintiff to get him a mattress. Plaintiff picked up a mattress and took it to Whisnant in the corner, taking the sheet off as Whisnant directed. Plaintiff stood the mattress up in front of Whisnant so that Whisnant was almost completely barricaded in the corner. As he was doing so, Woods repeated that "I'm giving you guys a chance right now," to which Whisnant responded, "You fuckin ain't giving no chance

---

[6] Plaintiff has not specifically controverted the transcript (Doc. 47-2) of the body camera video produced by Defendants but in any event, the statements recounted here are incontrovertibly shown by the body camera recordings. (Doc. 21, Exhs. 8, 9, 10.)

you pussy-ass bitch."  Woods asked about the glass on the floor; Whisnant said he had broken the kiosk.  (Woods video at 11:02-11:03.)

Defendant, who had entered the catwalk by this time, asked Plaintiff if he "was a part of this."   When Plaintiff shrugged his shoulders, hesitated, and said equivocally, "I mean…," Defendant told him to "go over there."  Plaintiff responded, "I'm not going over there," to which Defendant said, "Then you're going to be a part of it."  (Voigts video at 11:03:21.)  Defendant was aware of Plaintiff's altercation a few days prior involving several officers.  (Doc. 47 at 4; Doc. 53 at 7.)  Whisnant began yelling to Plaintiff, apparently trying to encourage him not to cooperate with the officers, but Plaintiff, after visibly hesitating, turned his back to Whisnant and went to stand by a table toward the other end of the cell.  According to Plaintiff this is where officers indicated he should go.  (Doc. 53 at 7.)  Whisnant continued to yell to Plaintiff.  Woods attempted to convey a warning but had trouble making himself heard over Whisnant, who continued to interrupt.  Woods raised his voice and said, "Hey! I'm gonna give you fuckers" but Whisnant shouted back, "Fuck you, bitch!" as Woods continued that he was going to "give you five seconds to clean this shit up."  Before Woods could finish his statement, Plaintiff sprang from his position by the table, where he had been standing for a couple of seconds, and rapidly crossed the cell to approach Woods, who was standing just outside the locked cell door with his hands on the bars. Plaintiff came close to Woods, raised his arms, and angrily yelled at Woods, "Fuck you, you bitch ass motherfucker. Don't tell my mother fucking homie to shut up, you shut your mother fucking mouth.  You hear me? You shut your mother fucking mouth."  (Woods video at 11:03:45-47.)  As he was doing so, Plaintiff raised his right hand close to Woods' chest as if he were going to strike Woods, but he hit the cell bars directly in front of Woods instead.  (*Id.*)  As this was happening, Defendant, who was standing by Woods' right side, drew his taser and pointed it at Plaintiff.  A

red laser targeting dot from the taser was visible, first on Plaintiff's face, and then on his chest as Defendant moved to his left and pointed the taser at Plaintiff through the space in the cell bars. (*Id.* at 11:03:51 p.m.; Taylor video at 23:03:30.)  Plaintiff concedes he heard the word "taser" and saw Defendant pulling out his taser.  (Doc. 54-1 at 13.)  As Plaintiff was yelling at Woods, he reached his left hand through the opening of the cell bars and gave Woods a shove in the chest. Although Plaintiff denies making any physical contact with Woods, the video recordings from the officers' body cameras blatantly contradict that assertion.  They clearly show Plaintiff pushed Woods, with the push sending both Woods and Plaintiff slightly backwards.  The body camera video of deputy Taylor is especially clear on this point, although all three body camera videos confirm that Plaintiff made contact with Woods.  (Woods video at 11:03:51 p.m.; Voigts video at 11:03:44; Taylor video at 23:03:38.)  Just after Plaintiff shoved Woods, Defendant aimed and fired his taser at Plaintiff, who (according to Plaintiff) was about four feet away from Defendant at that point.  The probes struck Plaintiff in the chest and abdomen and caused him to fall to the floor.

Plaintiff asserts that when he saw Defendant draw his taser, Plaintiff "immediately started stepping backward, raising his arm at his sides to surrender." (Doc. 53 at 10.)  Although the video shows that Plaintiff was in fact moving backwards when the taser was fired, it also shows that this occurred almost immediately after Plaintiff shoved Woods, that just before the shot Plaintiff was still yelling profanities at Woods, and that Plaintiff did not raise his hands in any sort of surrender gesture.  Plaintiff also asserts that he "started to say please don't tase me" at that point (Doc. 54-1 at 13), but the video shows Defendant deployed the taser just as Plaintiff concluded telling Woods to "shut his motherfucking mouth," and as Woods was directing officers to open the cell door. (Voigts video 11:03:44.)

Plaintiff felt excruciating pain and yelled to "please stop."  (Doc. 54-1 at 13.)  When the tasing stopped, officers unlocked the door and came in the cell.  Woods removed the taser prongs from Plaintiff's abdomen and chest.  Officers handcuffed Plaintiff and Whisnant and removed them from the cell. (*Id.* at 13-14.)  Franklin County EMS evaluated Plaintiff, deemed him to be fine and in normal condition, and cleared him medically.  (Doc. 47 at 7.)

According to Plaintiff, he asked Defendant why he tased him, but Defendant did not answer.  Plaintiff told Defendant he was in the wrong and asked for an apology, but Defendant said nothing.  Plaintiff contends he heard Woods ask Defendant why he tased Plaintiff.  (Doc. 54-1 at 14-15.)

Defendant asserts that he perceived an escalating situation, in which Plaintiff committed a crime right in front of him, and in which an entry into the cell likely would have resulted in a physical encounter that put everyone in jeopardy.  He contends he used the taser to deescalate the situation and to maintain discipline and compel Plaintiff's obedience.  (Doc. 47-3 at 13.)

Plaintiff claims that Defendant's actions violated his right to be free from excessive force under the Eighth and/or Fourteenth Amendment.  (Doc. 30.)  Defendant argues he is entitled to summary judgment because the Eighth Amendment does not apply, because Plaintiff fails to show a genuine issue of fact as to whether Defendant's conduct was unreasonable under the Fourteenth Amendment, and because Plaintiff has not overcome the defense of qualified immunity.

## III. Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are

"genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Id*.  Any statement of fact that has not been controverted by affidavit or an exhibit is deemed to be admitted.  D. Kan. Rule 7.4.  Also, the court will only consider facts based on personal knowledge or supported by exhibits. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### B.  Excessive Force

Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendments, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force.  *Vette v. K-9 Unit Deputy Sanders*, No. 20-1118, 2021 WL 837126, at *10 (10th Cir. Mar. 5, 2021) (citing *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020)). Plaintiff was a pretrial detainee at the time of this incident, so his claim is subject to a standard of objective reasonableness under the Fourteenth Amendment.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (A pretrial detainee alleging excessive force must show that force used against him was objectively unreasonable.)

Objective reasonableness turns on the facts and circumstances of each particular case. *Rowell v. Bd. of Cty. Commissioners of Muskogee Cty., Oklahoma*, 978 F.3d 1165, 1171 (10th Cir.

2020) (citing *Kingsley*, 576 U.S. at 397).  Courts make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  *Id.* (citing *Kingsley,* 576 U.S. at 397).  "The analysis must account for the 'legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.'"  *Id.* (quoting *Kingsley,* 576 U.S. at 397).  Factors that may bear on the reasonableness or unreasonableness of the force used include (but are not limited to): "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley,* 576 U.S. at 397.

### C.  Qualified Immunity

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity."  *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).  Qualified immunity "shields public officials ... from damages actions unless their conduct was unreasonable in light of clearly established law."  *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quotations omitted).  "If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

When the defense of qualified immunity is asserted, a plaintiff must show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and … (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *Cillo*, 739 F.3d at 460.  For a

right to be clearly established, the contours of that right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "It is not enough that the rule is suggested by then-existing precedent." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). The rule at issue "must be 'settled law'" dictated by controlling authority or a "robust 'consensus of cases of persuasive authority.'" *Id*. at 589-90. This does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft*, 563 U.S. at 741 (2011)). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby,* 138 S.Ct. at 590. Moreover, the standard requires "that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.*

## IV. Analysis

The court need not determine whether Defendant's use of a taser could be found to be objectively unreasonable and therefore a violation of Plaintiff's rights under the Fourteenth Amendment. Even assuming that a reasonable jury could make such a finding, Plaintiff has failed to meet his burden of showing that Defendant's actions violated clearly established law. Defendant is therefore entitled to dismissal on the basis of qualified immunity.

In arguing otherwise, Plaintiff assumes a fact contrary to the uncontroverted facts: he maintains that he never touched Woods. But as noted above, the videos clearly show that Plaintiff shoved Woods in the chest. A reasonable officer in Defendant's position could have believed that Plaintiff's assault upon Woods, when considered with all the other circumstances, justified the use of a taser to bring Plaintiff under control and to restore and maintain order in the facility. This

conclusion is only enhanced by the fact that Defendant was aware of Plaintiff's conduct from a few days earlier, when Plaintiff strenuously resisted the efforts of multiple officers to subdue him after he had flooded and damaged a cell. *See e.g., Williams v. Ward*, No. CV 6:18-1138-TMC-KFM, 2018 WL 6933433, at *3 (D.S.C. Oct. 26, 2018), report and recommendation adopted, No. 6:18-CV-1138-TMC, 2018 WL 6695718 (D.S.C. Dec. 20, 2018) ("Sgt. Ward's limited use of the taser (two shocks) to gain control of the plaintiff and restore order was clearly reasonable, particularly in light of his knowledge of the plaintiff's high risk history, most recently requiring S.W.A.T. team intervention only days earlier.")  In this instance, Defendant was confronted by a pretrial detainee with a recent history of violent resistance, who appeared to assist his cellmate in barricading himself in the cell (by retrieving a mattress for Whisnant) while at least one of the detainees was intentionally destroying property.  Defendant was also confronted with the fact that Plaintiff threatened the officers, both impliedly ("Y'all ain't comin' in") and expressly ("You come in here, I'll push you up against that wall"), as the officers attempted to restore order.  Defendant had to consider that Plaintiff abruptly left the area where officers had told him to go, rushed across the cell, and angrily confronted Woods and shouted profanities in his face – for the ostensible purpose of defending his cellmate.  Defendant then had to consider, in the midst of all this, the fact that Plaintiff suddenly assaulted Woods as Woods was attempting to restore order and regain control over the premises.  A reasonable officer in Defendant's position could have believed that the use of a taser was reasonable to prevent further assaults upon the officers, to force Plaintiff to comply with the officers' directives, and to restore and maintain control of the premises.  *Cf. Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 531–32 (6th Cir. 2018)  ("At some point, in response to defiance and belligerence, officers are entitled to 'preserve internal order and discipline.'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)); *Hunter v. Young,* 238 F. App'x

336, 339 (10th Cir. 2007) (finding qualified immunity on Eighth Amendment claim in part because "[w]e decline to second guess [the officer's] 'split-second judgments' about the necessary amount of force made in these 'tense, uncertain, and rapidly evolving' circumstances.") (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)).

Plaintiff cites no authority holding that the use of a taser in similar circumstances constitutes unreasonable force, nor does he cite any case law that would have otherwise put Defendant on notice that his use of force was unlawful. *Cf. Stevenson v. Cordova*, 733 F. App'x 939, 944 (10th Cir. 2018) ("we have not found a Supreme Court decision or a published Tenth Circuit case that is sufficiently on point. Nor have other circuit court decisions addressed a correctional officer's use of a taser in sufficiently analogous circumstances such that the constitutional question is beyond debate.") (footnote omitted.)

Plaintiff makes a number of arguments in support of his claim, but they are unavailing. He argues that "a reasonable person or officer would have perceived that [Plaintiff] was in fact surrendering" when Defendant tased him. (Doc. 53 at 13.) But Plaintiff's supposed manifestations of surrender – moving backwards and raising his arms – were anything but clear. Plaintiff's backward movement could have been viewed by a reasonable officer as a "hit and run" tactic, whereby Plaintiff struck Woods and then temporarily retreated, or it could be viewed as simply the result of Plaintiff having pushed back off of Woods. Additionally, the videos blatantly contradict any assertion that Plaintiff raised his arms in an indication of surrender. The videos show Plaintiff's arms were not raised when Defendant fired the taser. (Woods video at 11:03:53 p.m.; Voigts video at 11:03:47 p.m.) In any event, a reasonable officer could have viewed Plaintiff's movements as indicating something other than surrender to authority. Plaintiff also complains that Defendant could have given him a warning before using the taser or that the officers

could have avoided danger by backing away from the locked cell.  These are undoubtedly factors that could be considered in determining whether the use of force was reasonable, but merely asserting such arguments fails to show that the law concerning them was clearly established such that a reasonable officer in Defendant's position would have known that using the taser was unlawful.  Plaintiff also argues that Defendant failed to follow departmental policies and training concerning use of a taser.  Even if true, however, that similarly fails to show that the law was clearly established that such actions violated the Fourteenth Amendment.

## V.  Conclusion

Plaintiff's motion to file under seal (Doc. 54) is GRANTED.  Plaintiff's motion to file a surreply (Doc. 61) is DENIED.  Defendant's motion (Doc. 60) to strike Plaintiff's surreply is GRANTED; the court directs the clerk to strike Doc. 59.  Finally, Defendant's motion for summary judgment is GRANTED; the clerk is directed to enter judgment of dismissal in favor of the Defendants.  IT IS SO ORDERED this 23rd day of March, 2021.


_____ s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATED DISTRICT JUDGE

14